May it please the Court, my name is William Myers. I'm here on behalf of Plants and Appellants, the Idaho Wool Growers, et al. I'd like to reserve three minutes of my time for rebuttal. This case arises out of the Forest Service's decision under NEPA on whether or not to reduce domestic sheep grazing on the Payette National Forest in Idaho. Based on a flawed NEPA analysis, the Forest decided to reduce sheep grazing on that forest by 70%. NEPA requires three essential elements, and this is from the regulation at the very outset of the NEPA Regulations 40 CFR 1500.1. First, expert agency comments. Second, public scrutiny. And third, accurate scientific analysis. The Forest Service here failed on all three counts. It failed to solicit the comments. Can I just back up one bit? My understanding of NEPA is that if they recognized all the issues, what plan they chose from it is not a NEPA issue. Is that right? In other words, it's an analysis issue. It's a procedural statute. And if they concluded that if they recognized that there were data problems and that there was a lot of uncertainty and so on, but then they made a decision, you can't challenge the decision on the basis that there wasn't significantly clear data or proof. Is that right? NEPA is a procedural statute. It does not determine the outcome of the decision-making. So, since this NEPA statement is just replete with recognition that there is just a real problem trying to find out exactly what's going on here, but all in all, they've concluded that it's more likely that there's a risk than there isn't one, and they're going to proceed on that basis. Your complaint has to be not about, well, there was, they couldn't go forward because there wasn't clear enough risk. It has to be that they misunderstood the risk. Right? Our complaint, Your Honor, is that they did not do a sufficient analysis to provide a full and fair consideration of the science that led to their decision. But that's not a challenge to the decision. We do not have the ability to challenge the decision per se. We only challenge the decision. Because I think there's a spillover here sometimes in the briefs here. What was the science they ignored? Dr. Knowles? Dr. Knowles in person, but as an agency, the entire Agricultural Research Service has ignored, Your Honor. But they certainly took into account Knowles' criticism. They weren't secret. Actually, Your Honor, the process that's required by NEPA is very clear under both the statute and under the regulation. Under both the statute and the regulation. They should have consulted, but I'm saying, basically, what harm was there as a result of their failure to take the procedural step? It wasn't as if the Agricultural Service's views, at least embodied in Dr. Knowles, were known and considered. Well, if I could, Your Honor, I would suggest that they, in fact, were not known. And this is why, let me explain. Under the statute, the lead agency, the Forest Service, has an affirmative duty, to the fullest extent possible, that's the statutory language, to obtain the special expertise of any federal agency that is relevant to the issue they're considering. And there's a very important time limitation on that. That duty arises after they've prepared the draft Supplemental EIS. And it concludes when they finish the final Supplemental EIS. So there's a window of time there in which the lead agency is required to go to its sister agencies in the federal government, affirmatively seek out their advice and counsel on the draft document. So anything that Dr. Knowles may have said prior to that draft document, while interesting and important from a scientific relevance, is not specific to the document. So what the Forest Service missed out on, the prejudice to the Forest Service, to the public, and to my clients, was the ability of the Agricultural Research Service to provide written comments on the draft. And the purpose of that is also clear in the regulations. The purpose is to allow the drafting agency, the Forest Service, the opportunity to consider those comments, to modify their draft, to improve their draft, to change the facts in their draft, to supplement their draft, or. One thing that's a little odd here is, and I don't understand quite how the system works, because I gather nothing's stopping Mr. Knowles from writing those same comments as comments and submitting them. Right? He could have just done it. He could have, but the statutory requirement is for the Forest Service to solicit them in writing. So the Forest Service should have contacted his agency. But if he had anything to say, he could have just said it. I don't know when he learned about when the draft EIS was out. He did at one point, after the final EIS, read the document and say. But it was public. I mean he has as much access to it as anybody else did. But the Forest Service had the affirmative duty to seek out written comments and attach those comments in writing from ARS. As they would have if he had made the comments just to make the comments. And he has a member of the public and they do respond to all the comments. But the comments would have had to come from his agency, from the ARS. And it could have. I mean they could have filed it. I mean sometimes one agency files. It's a funny requirement because it seems completely formulaic. I mean it's a question of whether I go ask you to do something that you could do anyway. Let me explain that or respond to that, Your Honor. The reason is at the heart of NEPA, and it is in the heart of NEPA, it's in the same section that requires an EIS from any agency on any significant federal action. The reason it's there is because Congress wanted to make sure that the lead agency affirmatively sought out the written comments of its other agencies with expertise so it would not go off and do something blindly or inappropriately. So just to clarify, are you saying Dr. Knowles would not have been responding on behalf of ARS? I assume ARS would have turned to Dr. Knowles and said to Dr. Knowles, would you please respond to this draft EIS? And so he critiqued the draft, and was there anything material between the draft and the final version that he would have, you think he would modify his critique at all? I don't know that he critiqued the draft. He critiqued the final after it came out, and he said that there were mistakes in the way because of the failure of the Forest Service to consider some important studies that we talk about as part of our supplementation plan. So the introduction to the EIS says, there are scientists and others primarily from agricultural disciplines who contend disease transmission between bighorn sheep and domestic sheep is not a relevant factor. And then they go and they summarize, this is what these people say, and they go on and on and on about all the different things they say. And basically it's a summary of what Dr. Knowles eventually said, isn't it? But Dr. Knowles was not responding to the specific ideas. The draft EIS, Your Honor. But what I'm saying is they perfectly well knew what the critique was, and they said what it was. I would submit to you that they could not have known because the draft EIS is specific to the Payette National Forest where these sheep were. So the Payette National Forest draft EIS would have talked about the baseline on that forest. It would have talked about the alternatives that were being proposed for the action. It was laid out in multiple chapters, the environmental status quo and the environmental consequences of each alternative. Those are the details in a draft EIS that goes on for hundreds and hundreds of pages that Dr. Knowles did not have an opportunity to review. He's a scientist, right? Yes, Your Honor. And so I guess I'm still left, after my colleagues' questions, wondering what specifically in terms of substance would Dr. Knowles have offered the Forest Service during that window between the draft and the final EIS that they didn't already know? I think the answer to that comes from looking at the declarations that Dr. Knowles filed in this case. And this is an odd posture, I will grant you. Dr. Knowles was invited to testify by declarations by the District Court to see whether there were any problems with the underlying documents. And so in those declarations, he went back and he looked at the documents and he then completed his declarations. And if you were to look at my brief to the court below, I summarized those in multiple tables beginning at ER 96 through. But his basic critique, I mean, yeah, there were a lot of details, but the basic critique was that you haven't proven a sub. Maybe, you know, there wasn't, the proof wasn't good enough. And the EIS goes on, says over and over and over again, yes, that's what these people primarily from agricultural disciplines say. And we understand, we have, as I understand what they're saying, we understand we haven't proven it enough. But we have, but our reading of the available information is that it's, you know, much more likely that this risk exists than if it doesn't. And we have to act in some manner, and this is how we're going to act. That's why I began by saying that you seem to really be critiquing not the analysis, but the action that was taken as based on insufficiently strong proof. But if that's not it, they certainly have acknowledged 100 times that, you know, we're doing the best we can and doing the best that we haven't proved it. But we've proved it to the degree it's provable at this point, and we've decided that that's enough proof. That's what we've decided. This court had a similar situation in the case of Warm Springs Dam Task Force versus Greco, in which the U.S. Army Corps of Engineers had an expert from another agency, the U.S. Geological Survey, who was concerned about an action that the Corps of Engineers was going to take. And the court looked at that situation and held the Army Corps of Engineers in violation of NEPA because it did not obtain those comments. Now, if you look at the facts of that case, the court was excused from that violation because it made additional efforts beyond the litigation context to cure the defects. But at the core of the court's holding was that the Corps of Engineers had violated NEPA because it had failed the clear duty of NEPA and its regulations to extract that knowledge from ARS in response to the specific question that was before it. Let me just go back to my question. I'm still waiting for an answer. At least I got it clear in my mind. Dr. Knowles is a scientist, so his critique, had he been consulted, would have been on the validity of the science underlying the decision. I think I'm with Judge Burns on that. All he would have said, unless you're going to tell me otherwise, is that, hey, guys, your reliance on this science is flawed because I've reached contrary conclusions, or at least I would if I studied this long enough. And I think they acknowledged that there was uncertainty and that nobody was going to know for sure one way or the other. But in light of that uncertainty, they thought it was better to err on the side of protecting the bighorn sheep. So what specifically, in terms of the scientific critique Dr. Knowles would have offered during that window, did the Forest Service not already know? They did not know, Your Honor, one of the key aspects of their primary assumptions, which was really the entire purpose of this exercise. And that was whether domestic sheep could transmit a deadly pathogen to bighorn sheep and cause their death in the wild. And they said, as I understand it, we don't know that. We are not positive. We understand that we're not positive. But reading all of the available evidence and given the risks and given how many of these sheep have been dying, we're going to call the risk in that direction. That's what I understood them to have said. And they acknowledged 100 times that they didn't know and it wasn't proven. But they, Your Honor, they did that, but they did that without fulfilling their NEPA core requirement to ask the experts that were in the federal government. The experts were not in the Forest Service. They were at ARS. It wasn't a person of Dr. Knowles. Thank you. I guess that we're sort of assuming that that may be true. But the question is, why isn't this harmless? It's not harmless because the Forest Service did not benefit from his knowledge and his view of the document that they were studying. The public did not benefit from his knowledge because the written comments that he would have provided were required by statute to accompany the draft so the public could also see what he was saying. And my clients were prejudiced because the outcome of the decision seems to be based on a violation of the procedural statute that requires full and fair consideration of the environmental impacts before a decision is made. Okay, you have a minute and a half. I'd like to reserve that time, I think. Thank you. Good morning. Robert Lundman representing the Forest Service. I'm going to use ten minutes and leave five minutes for Ms. Rule representing the interveners. Starting off with the ARS issue, as the court noted, the EIS looks at this and Dr. Knowles' concern over and over again. It explains disease transmission. The exact mechanics are not proven. But all the scientists agree that there is a risk. There's complete consensus on this. And the experimental evidence and the anecdotal evidence, all of which is captured at ER 767, shows that the Forest Service here reasonably concluded that there's a real risk and that separating and attempting to separate the bighorn sheep from the domestic sheep is a sensible course. We know what Dr. Knowles would have said here because he sent in comments in the final EIS and then he submitted a declaration in district court. We don't think that was appropriate, but it happened. We saw the comments. And the EIS has responses to all of those. And so it's just not a case where we don't know. There's some uncertainty about what Dr. Knowles thinks or would have said. We know what he said, and the EIS, the final EIS, responded to that uncertainty to his scientific concerns already. So this is just a quintessential case of harmless error on that point. In any event, going back to the first question about whether the agency, Agricultural Research Service, has the relevant expertise here, it doesn't have the special expertise that triggers the NEPA consultation duty. The proper inquiry here isn't whether there's an employee there like Dr. Knowles, but rather you have to look at what the agency itself does, if the agency's program expertise and experience statutory responsibility. And that's how special expertise is defined in the NEPA regulations. And when you look at what ARS does, it's the Agricultural Research Service. Its expertise is agricultural issues. The Forest Service, in contrast, it's the expert wildlife management agency here. And if you look at how the Department of Agriculture, which houses both of these agencies, divides up its responsibilities, it delegates, and we capture all this in our brief, it delegates the wildlife management activities and issues to the Forest Service, while the Agricultural Research Service is delegated agriculture issues. So. But it is a relevant factor to know about domestic sheep, and that's what they do know about. I.e., what diseases should the domestic sheep get given, how are they transmitted, and so on. That's all relevant information. And, in fact, it was information that was used. So, I don't find that argument particularly persuasive. The fact that they just know a piece of the problem doesn't mean they're not relevant. Well, I just think it's their relevant, their expertise on agriculture issues and domestic sheep disease, domestic sheep don't get these diseases. They may carry them and transmit them. But they give them. The whole point is, the whole argument is that they're communicating the diseases. If these people who are agricultural experts were able to demonstrate that these sheep don't get pneumonia so they couldn't be giving it to the bighorn sheep, how could it not be relevant? Well, these sheep don't get the pneumonia. They carry it. I understand that. But if they were able to prove that they don't carry it. There's obviously relevant information about the domestic sheep and their ability to carry disease here. Even if they're not experts on the wildlife impact of it. Well, I don't think so. They have not, the plaintiffs here, Idaho wool growers, have not identified what agricultural information, what domestic sheep information. I just identified it. Do these sheep, in fact, get these pathogens? And do they, in fact, carry them? And can they, in fact, infect anybody with them? They carry them. They don't infect the domestic sheep. All of the impact here, all of the environmental impacts, and all of the regulatory framework we're talking about here is on the bighorn sheep side. The Forest Service is actually here to amend the plan, was to ensure viability and habitat for bighorn sheep. And so if you look at what the Forest Service was doing and what it was analyzing, it's on the bighorn sheep side of the equation. It's not on the domestic sheep side of the equation. Sure, we're talking about a reduction in acres available for domestic sheep grazing. But what we're not talking about is impact on agriculture. I don't know why you're fighting so hard on this, given the harmlessness of the question. I'd like to answer that. Let's say that Dr. Knowles at the time was the world's foremost leading expert in the transmission of disease from domestic sheep to bighorn sheep. And he happened to work in that agency. You're sitting here saying that, well, no, why bother talking to him? He wouldn't have anything relevant to tell us. There would be no obligation to consult with him. I think that's absurd. Just because of where he works, that's what you're telling us. Oh, he works on the wrong side of the issue. But he's the world's foremost leading expert. Why wouldn't there be an obligation to consult with the man? Because the obligation is at the agency level. And if it's not at the agency level, it gets in the way. But he works for that agency. If that agency has that relevant body of knowledge that you, as the representative of the Forest Service, need to make a decision about this, why wouldn't you have an obligation to consult with him? I have a colleague at DOJ who's a former marine biologist. She is an expert in marine biology. If it was a marine biology case, there's no reason that the domestic sheep and a bighorn sheep case. They're equally important. So he works on the side that has the domestic sheep. But he happens to be the world's foremost expert on something that goes from one side to the other. You just can't, with a straight face, say, in that scenario, that there wouldn't be an obligation to consult with him. I think you have to look at the agency's special expertise. And that's the NEPA regulatory definition. A good example of arguing something that, A, is weak, and, B, that we've basically already gotten to the point of the real issue is, does it make any difference? I completely understand. I'm not trying to be difficult on this. What I'm worried about, I'll just be frank, is an opinion that says the proper scope of inquiry is on the employee. And that puts a NEPA burden on agencies to figure out, if there is a worldwide expert, how is an agency that does not have that special program expertise? And I'm worried that the opinion would trigger these duties that the agency is going to build on. And here we have an agency that's specialized in agriculture, including agricultural animals. And we have a problem about an agricultural animal, you know, quite aside from whether or not this is the world's leading expert on transmission to bighorn sheep. But we have to know something about those animals. So it doesn't seem like much of a stretch to say, sure, you should have asked them, but what difference does it make? You already knew what they were going to say, and you said you knew what they were going to say. I completely agree. I.e., the agricultural people think this in great length. So, you know, it's funny. We're sort of talking past each other, it seems. Counsel for the wool growers says that violation was not consulting the agency. And your response was, oh, well, we got their information through Dr. Knowles anyway. At least that was the sense of us up on the bench, so no harm, no foul. But their argument is, well, they should have gone to the agency. And you're saying, well, Knowles wasn't in the right agency. And so we want to go back and say they didn't have any obligation to talk to the agency at all. Because you don't want the Forest Service to be responsible for asking somebody as a world expert on the whole critical question as to whether or not there is science to support this assumed risk. So let's assume that we bought your argument that ARS was not the right agency. Are you saying that under NEPA there is no obligation to inquire of the best science available? No, there is. There is. And here the agency. But that would be the individual Dr. Knowles. There would be no obligation to consult with him specifically to be required to obtain his comments. So it would be reached through the best science prompt? The NEPA analysis would have to take a hard look at the scientific question. And here the agency really did. I understand it. But you're worried about a precedent from the circuit imposing a new duty. And I'm trying to understand what the dimension of your concern is. They kind of seem to agree that the proper inquiry under NEPA is to the agency. And you want to fight that battle on they didn't have to go to ARS at all. So apparently that's what your argument is. Well, the first argument is they didn't have to go to ARS at all. They then point to Dr. Knowles. And I think their briefing focused on his expertise. No, I know it did. That's why we thought the individual was important. That's what we were trying to say. Under harmless error, they got the benefit of Knowles' information. Right. And the Warm Springs case, which Mr. Meyer cites, that's the court there said there was a violation of the obligation to consult, but it was harmless because the agency had taken a look at the issue. And that's what we have here. So just to put a bottom line on my question, you don't dispute as the representative of the government that if Knowles has this exalted position as a prime expert on the transmission of this pathogen, that under the environmental laws, your agency that you're representing would have had an obligation to at least consider his critiques. If he had sent his critiques in and he was the worldwide preeminent expert, sure, they have to take a look at that. And they don't have to search him out, though. Right. They have to adhere. You know, his papers are all in the record. To the extent he has relevant scholarship, they're cited in the record. The Lawrence study that he was a co-author of is cited in the record. You're saying the Forest Service didn't have any obligation to look to the literature and see and identify some scientific resource that could answer the question. His research is part of the equation. They don't have an obligation to speak with every expert. They don't have a right to research to identify leading experts on a subject. Well, they have an obligation to accurately and thoroughly take a hard look. Search for it. Search for it. That's what you were concerned about, imposing an obligation on the agency to initiate an inquiry. And you're trying to decide whether there's a pathogen transmission. And the literature is public and published. And you're saying that the Forest Service people don't have an obligation to become aware of a preeminent authority like that? No, they do. Okay. They don't have an obligation to do the consultation provision their claim is based on. That's a different. Yes. So unless you have any further questions for me, I'll pass to you. Thank you. I'll just take a couple minutes. I think as you raised previously with regard to Claim 1, the key issue here is the harmless error issue. Under 5 U.S.C. 706, you must take due account of the rule of prejudicial error under the APA. When you're assessing whether to provide relief. And under the Drake's Bay Oyster Company v. Jewel case at 747 Fed 3rd 1073, which we cited in our brief, you don't even have to resolve the merits of that claim if you determine that there was harmless error, even if a NEPA violation occurred. This case falls in line with the Warm Springs Dam Task Force case that has been cited, as well as the Laguna Greenbelt case that we cited in our brief, which is at 42 Fed 3rd 517. In all of those cases, there were procedural NEPA violations, but the Court held that no relief was warranted because there was harmless error. The agency did what they had to do. They met NEPA's goals, and obtaining, like in the Warm Springs Task Force case, obtaining any comments at that point would have been fruitless. The same is true here. Obtaining any further comments from Dr. Knowles would have been fruitless. The Forest Service recognized the uncertainties in EIS. They responded to comments, particularly if you look at ER 773 with that list of concerns by agricultural interests that identified most of the same things that Dr. Knowles identified in his declaration. If you look at response to comments in the appendix of the EIS at ER 1023 and ER 1029 to 1030, again the same issues that Dr. Knowles raised in his declaration were addressed in the EIS by the Forest Service. Clearly, nothing more could come of any further comments. The Forest Service recognized the uncertainties over and over and decided they nevertheless still needed to act to provide separation between domestic sheep and big orange sheep. This is not a case questioning the result. This is a case all about the procedure, and the procedure here was valid. It met NEPA's goals. The decision maker was fully informed. The public was fully informed. There is no relief warranted, and therefore, you don't even have to reach the merits of that claim. I'm just going to, I see with my 40 seconds left, also note that the models that the Forest Service used were reasonable. They relied on well-qualified experts from their own agency. They relied on their own national big orange sheep experts. They relied on experts from Oregon, Washington, Idaho Fish and Wildlife agencies. I mean, again, in each instance, I mean, the models seem to have gaps, big gaps in some instances, but they recognized that, and they relied on them to the extent they relied on them. I mean, the last one in particular, I don't understand this thing about the different percentages very well. I gather what they were doing was simply trying to figure out, they were assuming the transmission at various levels of risk, and they were trying to figure out whether the sheep would then die off, whether the big sheep, whether the whole group of sheep would die off. But it was based on an assumption about transmission, so they said they couldn't demonstrate. So it wasn't worth a whole lot. They didn't really use it for a whole lot. There's not a lot of data. I mean, a lot of the parameters that the wool growers, you know, complain about not having data for in their models, there is no data. The Forest Service recognized that, and that's why they used the range of probabilities. They said, we don't know, we don't have any data to plug into our models about, you know, how much contact there is and how, you know, what the percentage, what the probability is of the bighorn going back to his herd and what the probability of the disease running throughout the herd. They don't have the data for that. So they used this range of probabilities. Well, we'll assume anywhere from 5% to 100%. Wool growers complained that, oh, they didn't use 0%. Well, we all know what the answer of 0% is. It's zero. And so they essentially looked at, okay, there's a 5% risk of disease transmission, 10%, 20%, 25%, 50%, 75%, 100%. We'll look at this range of probabilities, and we'll use that to compare various alternative actions. That's what they say on ER 816 in the EIS. We're not trying to come out with a hard and fast result. We predict this is exactly the risk of extirpation. That's not what the point was. The point was to look at, okay, we have various alternative actions. They close various amounts of the domestic sheep allotments, and let's look at the impacts of these various alternatives under this different range. And so they ran the models for, you know, if there was 5% risk of disease transmission, this is what would happen under each alternative. If there was 20%, this would happen under each alternative. So then they could compare the alternative actions and determine based on that comparison which one they were going to choose so that they could minimize the risk to big horn sheep and provide for viable populations. They explained this in their EIS. They explained it in the appendix L of the EIS. They responded to numerous comments. I mean, there's, you know, pages ER 1098 to 1114 and 1119 to 1139. Those are all responses, comments at the back of the EIS about the models and the methodology. They revealed everything that they could. They revealed the uncertainties. That's all they were required to do under NEPA, and they had to make a decision. So they used this information as best as possible to make their decision. Thank you, Your Honor. Your Honor, I'd like to loop back to your concerns about the question of harmless error. I have a copy of the Warm Springs Dam Task Force case with me. It talks about the statutory requirement to obtain, as the court said, or attract knowledgeable agency comment on environmental issues raised by the proposed federal project. So the specific issue is the proposed action being considered by the Forest Service, not just generalized science of big horn sheep, domestic sheep, transmission issues that Goals had written on, but not specific to the document that was being considered by the agency. The court went on in the Warm Springs case and said, this requirement is essential to maintain the integrity and regularity of the decision-making process. So what was it that the agency obtained from ARS in its process of reviewing the draft EIS? I hold that in my hand. Out of a 70,000-page administrative record, they obtained one page of handwritten notes from one phone call solicited not by the Forest Service to ARS, but initiated by Dr. Knowles to the Forest Service. That's an excerpt of record 1840. So this is the extent of the knowledge. Because he did file something after he filed the EIS, and he filed material in court. Correct. So we know what he would have said. You're exactly right, Your Honor. We know that after the fact. Right. He was invited by the court to. Therefore, we can judge whether there is anything in those documents of what he actually said. But. That is any different than what the EIS assumed he was going to say. And basically, there isn't. What the Forest Service lacked was that knowledge before it made its decision. But it had it. It gave a whole list. It said, these people, like the agriculture experts, believe X. And they went on and on and on and on about everything they would say. And it's basically what he said. Dr. Knowles said one thing in his declaration that I want to use just by way of illustration. He said that one of the most important aspects of this entire problem is the dose of the transmission from one animal, the donor, to the recipient animal. Dose is determined by exposure over time. The Forest Service completely ignored the question of time in its analysis. Dr. Knowles pointed this out after the fact in declarations. But the critical point here is that that discussion, the importance of time in disease transmission, a situation that we all know from common colds, should have been considered before the Forest Service made its decision. We know it should have been considered because Dr. Knowles said so after the fact. But that was months after the decision had been made, after the Wool Growers Administrative Appeal had been denied, and, in fact, after this litigation commenced. That's why we're here. The Forest Service never went back and got the information it should have gotten from the experts in order to make a valid decision. We, of course, raise other issues in our brief, Your Honor. The faults with the disease model, the failure to comply with the lands council issues, the risk of contact model, the contradictions within the documents themselves, the failure to consider important aspects of the issues, the failure to look at the evidence before them. I have to rest on my breeze because we're out of time. But I do want to point out those flaws as well. No, we do, as I said at the beginning, we do read the briefs, believe me, intensively. So that's why you write good briefs. Thank you, Your Honor. Appreciate that. Thank you very much. Thank you. We will now submit the case of Item of Wool Growers v. Hillside. And we are adjourned. Thank you.
judges: Fisher, Berzon, Watford